UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

TAMEKA L.[1],                              )
                                           )
          Plaintiff,                       )
                                           )
     v.                                    )          CIVIL NO. 3:21cv900
                                           )
KILOLO  KIJAKAZI, Acting                   )
Commissioner of Social Security,           )
                                           )
          Defendant.                       )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant
Commissioner of Social Security Administration denying Plaintiff's application for Supplemental
Security Income (SSI) under Title XVI of the Social Security Act. Section 405(g) of the Act
provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the
transcript of the record including the evidence upon which the findings and decision complained
of are based.  The court shall have the power to enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with
or without remanding the case for a rehearing."  It also provides, "[t]he findings of the
[Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42
U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to
engage in any substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to last for a continuous period of no less than 12
months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1.      The claimant has not engaged in substantial gainful activity since August 29, 2019, the application date (20 CFR 416.971 *et seq*.).

2.      The claimant has the following severe impairments: major depressive disorder, bipolar disorder, generalized anxiety disorder, and post-traumatic stress disorder (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand, remember, and carry out simple instructions and make simple work-related decisions. She can tolerate occasional changes in work setting. She can tolerate less than occasional interaction with coworkers and supervisors, and but [sic] can have no interaction with the public.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on November 7, 1997 and was 21 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since August 29, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 21-31).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits,

leading to the present appeal.

Plaintiff filed her opening brief on July 6, 2022.  On July 18, 2022 the defendant filed a

memorandum in support of the Commissioner's decision, to which Plaintiff replied on August

15, 2022. Upon full review of the record in this cause, this court is of the view that the

Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See*

*Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-

91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test

as follows:

> The following steps are addressed in order:  (1)  Is the claimant
> presently unemployed?  (2)  Is the claimant's impairment "severe"?
> (3)  Does the impairment meet or exceed one of a list of specific
> impairments?  (4)  Is the claimant unable to perform his or her
> former occupation?  (5)  Is the claimant unable to perform any other
> work within the economy?  An affirmative answer leads either to
> the next step or, on steps 3 and 5, to a finding that the claimant is
> disabled.  A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present

case, Step 5 was the determinative inquiry.

Plaintiff was 21 years old as of her application date. (Tr. 139). She graduated high school

with special education services and received transitional services and vocational training. (Tr. 43,

46, 470, 497). Her only work was in brief trials at Goodwill and Subway in 2017. (Tr. 43, 47, 53,

248-49, 470).

Plaintiff has been diagnosed with major depressive disorder, bipolar II disorder, PTSD,

generalized anxiety disorder, and a mild cognitive disorder. She has suffered from depression,

mood swings, and anxiety since childhood, (Tr. 372, 410-12, 416, 469, 497, 505, 1431, 1883-84,

1988), and she has a history of cutting and thoughts of self-harm. (Tr. 362, 416, 469-70, 1912, 2131). She was born prematurely and had slightly delayed development. (Tr. 344). She has been treated with several medications with limited effectiveness. (Tr. 396-97, 401-02, 419, 470, 535, 1883, 2091, 2105-06). Meridian Services began providing home-based therapy in August 2019, which was interrupted by the pandemic after March 2020. (Tr. 1878-1990). Plaintiff's therapist, Jessica Stupeck-Mays, frequently described Plaintiff as anxious, stressed, and/or disheveled. (Tr. 1905, 1910, 1915, 1919, 1924, 1929, 1934, 1939, 1944, 1949, 1954, 1959-60, 1964, 1969, 1973, 1981, 1985, 1989-90). Plaintiff sometimes has visual and auditory hallucinations, suicidal thoughts, and flashbacks. (Tr. 470, 497-98, 505, 1879, 1883, 1897, 1899). She has a history of trauma and reports nightmares, paranoia, hypervigilance, increased startle response, marked anxiety in public, and panic attacks when she is around too many people. (Tr. 469-70). She rarely leaves the house due to anxiety and does not enjoy activities. (Tr. 469, 505, 1988-89). She often does not want to eat and sleeps during the day because she cannot sleep at night. (Tr. 372, 472, 497, 1879, 1882, 1988, 2134). She has anger outbursts and breaks things. (Tr. 472, 1924, 1944, 1989). Her periods of depression can last for a week or two at a time. (Tr. 1431). She stopped taking her medication in February 2019 during her first pregnancy, (Tr. 436); and again in January 2020, early in her second pregnancy. (Tr. 1929, 1934-35, 2003, 2013-14).

Kathryn F. Meyer, Psy.D., conducted a psychological consultative examination in December 2019. (Tr. 469-72). Plaintiff's then-boyfriend, Jason Redmond, said he has seen her "stay up for days at a time, crying, acting out in front of others, and not wanting to be around her newborn." He said that she exhibits decreased need for sleep, sleeping only three to four hours a night; distractibility; marked talkativeness; flights of ideas; and depressed mood and self-harm

5

(Tr. 469). Plaintiff has trouble understanding things and needs help with reading and writing. (Tr. 470). Plaintiff reported problems sustaining performance of any activity, with comprehension and memory, and with multi-step instructions and commands. (Tr. 472). On examination, she was able to repeat three of four words immediately but could only recall one after a five-minute delay. (Tr. 470). She could not complete serial sevens. (Tr. 471). Dr. Meyer found that Plaintiff's condition met criteria for bipolar II disorder and PTSD. Medical documentation of a cognitive impairment, "likely Mild Intellectual Disability," was consistent with her presentation and the information obtained during the evaluation. Plaintiff "did not appear capable of being around people regarding work-related activities, as she has a strong history of mood imbalance." She would require assistance managing any awarded funds. She "did not appear capable of gainful employment at this time, due to problems with comprehension and history of threatening behaviors toward others despite continued psychotherapy and medication." Sustained concentration and persistence were impaired. (Tr. 472).

In May 2020, while she was off Latuda and Seroquel during her second pregnancy, Plaintiff was brought to the ER early in the morning after she had cut herself and had an altercation with her boyfriend during which she started throwing things. She was admitted until the evening to monitor her severe depression. (Tr. 1427-33). She had been having several depressive episodes a week since she went off her medication and would have her boyfriend take her daughter away at those times. (Tr. 1436). She reported mood difficulties including anger and aggression, feeling "high and on top of the world" then crashing into depression. She said she did not mean to kill herself, but when she gets angry she loses control and takes it out on herself or others. (Tr. 1431). Psychiatrist Mallikarjun Patta, M.D., diagnosed bipolar disorder and explained

6

that it was not safe for Plaintiff to try SSRIs because of her serious mood disorder. While Wellbutrin would be safe during Plaintiff's pregnancy, it can cause low birth weight. Thus, Plaintiff decided against the medication. (Tr. 1432).

Amanda Mayle, Ph.D., conducted a second consultative examination in June 2020. (Tr. 497-502). Plaintiff stated that her recent cutting incident was an effort to kill herself. She goes to a "dark place," then her boyfriend has to take her baby and she does not want to be around anyone. She sees her dead father and "shadow figures." Her mind races about her worries and it is hard to focus on anything else. She has issues with reading, math, and comprehending what she is told. (Tr. 497). Her boyfriend has to make her get up in the morning to care for the baby and tell her to shower. (Tr. 500). She is "keyed up and on-edge constantly." She cannot take medication that would make her sleepy because she has to care for her baby. (Tr. 498). On examination, Plaintiff's immediate, recent, and remote memory were poor. (Tr. 499). She could not do serial sevens or threes and struggled with calculations. (Tr. 499, 501). Her mood was depressed and affect flat. Thought content included psychosis, overvalued ideas, obsessions, and preoccupations. Dr. Mayle found that Plaintiff's significant mood and behavioral instability appear to be affecting her functioning and that her functioning does not appear likely to change in the near future. Dr. Mayle diagnosed major depressive disorder, single episode, severe with psychotic features; generalized anxiety disorder; and rule out mild intellectual disability. (Tr. 500).

In August 2020, soon after her second child was born, Plaintiff was started on a low dose of Abilify. (Tr. 1998-99). Plaintiff told psychiatrist Rahia Qazi, M.D., after a week that Abilify was not helping and that her depression and anxiety had been worse since the baby was born. (Tr. 1882). Dr. Qazi prescribed Lamictal. (Tr. 1883).

Around 2:00 a.m. on January 27, 2021, Plaintiff was brought to the crisis program of Illinois' DuPage County Health Department by the police after her boyfriend had assaulted her. (Tr. 2130-41). She reported suicidal ideation. (Tr. 2130, 2136). She did not want to take medication because of her third pregnancy. (Tr. 2130).

At the hearing, Plaintiff testified that she and her two children have been staying with a friend because of her recent domestic violence situation. (Tr. 44-45). Plaintiff was pregnant at the time of the hearing, with her child due four months later. (Tr. 45; *see* Tr. 1678). Plaintiff has never had a driver's license; she has used public transportation in the past when she did not have to take her children with her, and otherwise gets rides from her friend or a transportation service through her insurance. (Tr. 45-46, 54; *see* Tr. 347 [ophthalmologist explaining Plaintiff cannot drive due to visual field loss]). Plaintiff has had difficulty taking the bus because she is often scared when she is alone. (Tr. 46). Plaintiff tried working at Subway but her anger got the best of her. (Tr. 47; *see* Tr. 470 [she left after swearing at and threatening a customer]). She always felt quiet and nervous because she did not like being around a lot of people. She does not feel comfortable in work situations. (Tr. 47). She got a job at Goodwill through vocational rehabilitation, but was only there for a three-day trial. She hoped people would not ask her questions because she would not know what to say or do. (Tr. 53). She would not talk to many people other than her one supervisor. (Tr. 53-54).

Plaintiff's first child was born in September 2019 and her second prematurely in July 2020. (Tr. 48; *see* Tr. 1075, 1609). She is working with Swanson Center, who will help her set up a plan to get back on medication after her child third is born and also get back into therapy. (Tr. 48). When Plaintiff took Latuda or Seroquel they made her sleep. (Tr. 49). With all the

medications she was prescribed in the past she still had a depressed mood and was very angry. (Tr. 49-50). She was in a very depressed state last year but while she was in therapy with Meridian it helped her to talk to someone. On most days Plaintiff is sad and does not want to do anything or go outside. She does not take a shower every day, does not want to eat, and does not sleep. (Tr. 50). She makes sure her kids eat, with her friend's help. (Tr. 50-51). Before living with her friend, the father of her children used to do the shopping, feed the kids, and take them to the doctor. The most Plaintiff does is to change the kids' diapers and bathe them. Her friend does the grocery shopping. (Tr. 51).

When Plaintiff went to the DuPage County Health Department they tried to place her in a 72-hour hold. (Tr. 51-52). She has had suicidal thoughts since last year when she cut herself and had to go to the hospital. She still hurts herself some days. (Tr. 52). She can go days or weeks without showering and has gone a couple of days without eating. (Tr. 52-53). She does not leave the house by herself unless she has to take her kids to the doctor. (Tr. 54).

In support of remand, Plaintiff first argues that the ALJ erred in her analysis of the psychologists' opinions. In December 2019, Dr. Meyer opined that, despite therapy and medication, Plaintiff did not appear capable of being around people to engage in work activity, or of gainful employment generally, due to her mood imbalance, threatening behaviors, and problems with comprehension. (Tr. 472). The ALJ found this opinion "not persuasive" because it appeared to be "based solely on [Plaintiff's] subjective allegations" and was "contrary to the normal mental status examination," and because Plaintiff had not been on her medications for "several years" and had only been in counseling for a short time. (Tr. 29). While Plaintiff had only been in therapy at this time for about four months, *see* Tr. 373, 1987, all of the ALJ's other

reasons are not supported by the record.

Dr. Meyer found that Plaintiff could not complete serial sevens, had difficulty with calculations, had limited recall abilities, presented and interacted in a manner "consistent with someone with intellectual disability," and had impaired sustained concentration and persistence. (Tr. 470-72). This was not a "normal mental status examination," and Dr. Meyer considered these findings in reaching her conclusions. (Tr. 472). The ALJ summarized some of the findings, but ignored Dr. Meyer's observation that Plaintiff's presentation and interactions were consistent with intellectual disability,  and misrepresented the report by claiming that the findings generally were normal. The ALJ's broad mischaracterization of the report and her decision to ignore objective findings were in error.  *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (ALJ's finding of fact is not binding if it "is based on errors of fact or logic") (citations omitted).

In addition to being inaccurate, the ALJ's objection that Dr. Meyer relied solely on Plaintiff's subjective reports was inappropriate. Although Dr. Meyer evidently relied on those reports to an extent, it was appropriate for her to do so. An ALJ only appropriately rejects an opinion on this basis if the source merely recites a claimant's complaints without offering a clinical impression or if the stated restrictions are inconsistent with other evidence. *Karr v. Saul*, 989 F.3d 508, 511-12 (7th Cir. 2021), *Prill v. Kijakazi*, 23 F.4th 738, 751-52 (7th Cir. 2022). That was not the case here. Rather, Dr. Meyer offered her clinical impressions of Plaintiff's objective presentation together with her history, as reported by Plaintiff and by her boyfriend, and the records Dr. Meyer reviewed, which she explained were consistent. (Tr. 472).

The ALJ's assertion that Plaintiff had not been on medication for "several years"  is also incorrect. At this time, in December 2019, after her first child was born and shortly before she

learned she was pregnant again, Plaintiff was taking Latuda. (Tr. 1929, 1934-35, 2003, 2013-14). Dr. Meyer noted that Plaintiff was taking Latuda but it was ineffective. (Tr. 470). Thus, Plaintiff had not been off medication for "years" before this resumption. Rather, she stopped her medication in February 2019 after learning she was pregnant, Tr. 436, and before then had been taking several medications since January 2018, the earliest point reflected in the record. (Tr. 396-97, 401-02, 419, 535, 2105-06). It is also not clear why the ALJ believed that Plaintiff's short time in therapy undermined Dr. Meyer's findings. Notably, Meridian provided therapy at Plaintiff's home because of her difficulty going outside. (Tr. 470, 1987-90). Plaintiff also saw social workers at her primary care office in 2018 and 2019 and there are references to previous counseling with Swanson Center. (Tr. 372-74, 405-08, 414-17).

Consistent with Dr. Meyer, Dr. Mayle found, seven months later, that Plaintiff had poor immediate, recent, and remote memory; she could not do serial sevens or threes and had difficulty with calculations; her thought content included psychosis, overvalued ideas, obsessions, and preoccupations; and her insight and judgment were immature. (Tr. 498-502). Dr. Mayle opined that Plaintiff's significant mood and behavioral instability appear to be affecting her functioning and that her level of functioning does not appear likely to change in the near future. (Tr. 500). She also observed that Plaintiff's mood was depressed and her affect flat. (Tr. 500). The ALJ did not address Dr. Mayle's examination as a medical opinion, and only addressed it at all by summarizing some of her findings. That was error. 20 C.F.R. §416.920c(b) ("We will articulate…how persuasive we find all of the medical opinions…"). Dr. Mayle's report was a "statement from a medical source" about "whether [Plaintiff has] one or more impairment-related limitations or restrictions" in the ability to "perform mental demands of work activities…," and

11

qualifies as a "medical opinion" that must be considered. 20 C.F.R. §416.913(a)(2)(i).

The ALJ's failure to address Dr. Mayle's conclusion is also significant because she failed to consider the consistency of the two examining psychologists' reports with each other and with the record as a whole, although this was one of the two factors the regulations required her to address explicitly. 20 C.F.R. §416.920c(b)(2); *id*. at (c)(2) (defining "consistency"). In addition to their similar objective findings, both examiners recognized that Plaintiff's mood imbalance or instability limited her functioning. (Tr. 472, 500). Dr. Meyer also assessed a cognitive impairment, Tr. 472, and Dr. Mayle found that intellectual disability was possible or warranted further evaluation, Tr. 500, whereas the ALJ found this was a non-severe impairment. (Tr. 22). Both examinations are also consistent with evidence such as that Dr. Qazi had to repeat most questions multiple times because Plaintiff had difficulty understanding, her speech was slow and difficult to understand, and her judgment was limited. (Tr. 1882-83). The ALJ's failure to address the examinations' consistency is especially significant because she also rejected the only contrary opinions in the record, those of the State agency psychological consultants. The ALJ's rejection of Drs. Meyer and Mayle was inappropriate because she did not rely on any other medical authority. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (an ALJ may not substitute her own judgment for a medical source's opinion "without relying on other medical evidence or authority in the record") (citations omitted).

In response, the Commissioner argues that the ALJ discounted Dr. Meyer's conclusion about Plaintiff's threatening behavior towards others because Plaintiff's social interaction was adequate during the evaluation. However, the ALJ did not state this reasoning. She only noted that finding in her summary of Dr. Meyer's report. (Tr. 26). The Commissioner's assertion cannot

bolster the ALJ's analysis. *Poole v. Kijakazi*, 28 F.4th 792, 797 (7th Cir. 2022) ("We must 'confine our review to the reasons supplied by the ALJ,' rather than allowing the government to invent new findings to rescue an insufficient decision on appeal") (citation omitted)*; see also Mandrell v. Kijakazi,* 25 F.4th 514, 519 (7th Cir. 2022) ("And the fact that [the claimant] was able to make it through one psychiatrist's appointment with a calm affect says nothing. She may well have found that to be a safe environment, unlike the world at large or a workplace").

The Commissioner also attempts to shift the ALJ's claim that Plaintiff had been off her medication for several years at this time to a claim that Plaintiff had "not been taking her prescribed medications during the relevant period" due to being pregnant, and specifically since August 2018. (Response Brief at 13, citing Tr. 1882). But that is incorrect. The record the Commissioner cites, from an August 2020 psychiatric visit, does not say anything of the sort. At that time, Plaintiff discussed how her recently prescribed Abilify was not working. (Tr. 1882). And as Plaintiff explained, at the time of the December 2019 examination she had resumed taking Latuda, which Dr. Meyer noted.  Plaintiff  had previously stopped her medication that February after learning she was pregnant, and before then had been taking medications since January 2018, the earliest point reflected in the record.

The Commissioner has not responded to Plaintiff's argument that the ALJ ignored objective findings, erroneously asserting that Dr. Meyer's opinion was based solely on subjective reports, nor to Plaintiff's argument that the fact that Dr. Meyer relied in part on subjective reports was not reason to reject her opinion. Rather, the Commissioner asserts without explanation or support that the ALJ's reasoning was well-grounded and that Dr. Meyer's "mere recitation of [Plaintiff's] subjective reports does not amount to a medical opinion on [Plaintiff's] functional

abilities." (Response Br. at 14).

The Commissioner also contends that "conclusory statements about an individual's ability or inability to work" such as Dr. Meyer's medical source statement are generally of minimal probative value. (Response  Br. at 12-13, citing 20 C.F.R. §416.920b). The Commissioner apparently refers to 20 C.F.R. §416.920b(c), which describes evidence that is "inherently neither valuable nor persuasive," such as statements that a claimant is or is not disabled or able to work. 20 C.F.R. §416.920b(c)(3)(i). However, the ALJ did not find that Dr. Meyer's opinion was conclusory.  Dr. Meyer's statement that Plaintiff "did not appear capable of gainful employment" was not simply an assertion that Plaintiff could not work. Dr. Meyer described her basis for that conclusion, *i.e.*, that Plaintiff has problems with comprehension and a history of threatening behaviors towards others despite treatment, together with her impaired concentration and persistence among other deficits on examination, Tr. 472, which is a finding about "whether [Plaintiff has] one or more impairment- related limitations or restrictions" in the ability to "perform mental demands of work activities…" and qualifies as a "medical opinion." 20 C.F.R. §416.913(a)(2).

The Commissioner only responds to Plaintiff's argument about the ALJ's failure to evaluate Dr. Mayle's opinion by contending that it does not qualify as an opinion.  However, in any event, the ALJ erred because she failed to consider Dr. Mayle's findings and her judgments about the nature and severity of Plaintiff's impairments and prognosis. The Commissioner asserts that the ALJ considered Dr. Mayle's findings in her RFC assessment, but that consisted only of summarizing some of the findings, and none of Dr. Mayle's conclusions. For instance, the ALJ ignored that Dr. Mayle found Plaintiff's memory was poor, that her thought content included

14

psychosis, overvalued ideas, obsessions, and preoccupations, and that her insight and judgment were immature.

The Commissioner has not responded to Plaintiff's arguments that the ALJ failed to consider the consistency of Dr. Meyer's findings with Dr. Mayle's and with the record as a whole, or that the ALJ's rejection of both opinions was inappropriate because she did not rely on any other medical authority. That the ALJ summarized some of Dr. Mayle's findings does not suffice to show that the ALJ considered the consistency of that evidence with Dr. Meyer's opinion. The ALJ did not identify "legitimate reasons" for rejecting the examining psychologists' opinions and failed to adequately consider them under the regulations.

Clearly, remand is warranted for a proper analysis of the psychologists' opinions.

Next, Plaintiff argues that the ALJ erred in her RFC assessment and Step Five conclusion. Plaintiff contends that the ALJ did not explain how she reached the mental and social limitations she included in her RFC, except to state broadly that the record supported greater limitation than the State agency reviewing psychologists had found. (Tr. 29). Plaintiff notes that the ALJ cited two pages from Dr. Meyer's report and one page from Plaintiff's May 2020 psychiatric admission in stating that the record supported limitation to unskilled work and further reduced social interaction, though the ALJ did not indicate to what in these pages she referred. (Tr. 29, citing Tr. 470-71, 1432). Those reports, consistent with the other evidence discussed above, support that Plaintiff's mood symptoms and anxiety are severe enough that she struggles to go outside but can struggle just as much at home. (Tr. 469-72, 1431-32). As the VE testified, no work would be available if Plaintiff missed more than one day per month or were off-task more than 15 percent of the day. (Tr. 56).

Because the ALJ used her flawed RFC as the basis for her hypothetical question to the VE,  the hypothetical question was also flawed. Thus her decision, based on the VE's response to a flawed hypothetical, is not supported by substantial evidence.

The Commissioner has not responded to Plaintiff's arguments on this point. The Commissioner only touches on Plaintiff's argument about the ALJ's failure to explain or provide a basis for her RFC by noting that she was not required to rely on a specific medical opinion, a point that Plaintiff did not contradict. Rather, the Commissioner recites some of the evidence the ALJ summarized in her decision and her analysis of the State agency reviewing psychologists' opinions and claims that this amounts to substantial evidence.

For example, the Commissioner describes some of the findings in the only two reports that the ALJ specifically cited in support of her conclusion that Plaintiff was limited to "unskilled work, with some additional social interaction limitations," Tr. 29, citing Tr. 470-71, 1432, claiming that Plaintiff did not show how that evidence undermined the ALJ's RFC finding. However, as discussed above, Dr. Meyer's examination and Plaintiff's May 2020 psychiatric admission support the severity of her mood and anxiety symptoms such that she struggles both at home and away from home. Dr. Meyer found, based on her examination, that Plaintiff did not appear capable of being around other people to perform work, Tr. 472, and the psychiatrist on Plaintiff's admission described her as dysphoric and anxious with impulsive judgment, and diagnosed a "serious mood disorder, probably bipolar," based in part on her reports of mood problems including anger, aggression towards others, and depressive crashes. (Tr. 1431-32). In any event, the Commissioner cannot now list some of the mental status findings to supply reasoning for how these two reports support the ALJ's conclusion, where the ALJ did not herself

indicate what in the reports she relied upon.  *Poole*, 28 F.4th at 797 (7th Cir. 2022) (citation omitted).

The ALJ's RFC assessment is unexplained, unsupported, and contrary to the record as a whole. Because the ALJ used her flawed RFC as the basis for her hypothetical question to the VE, the Step Five conclusion is also unsupported by substantial evidence. Thus, remand is required on this issue.

Next, Plaintiff argues that the ALJ improperly evaluated Plaintiff's subjective symptoms. Although an ALJ's subjective symptom analysis is entitled to deference, the ALJ is still required to "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Accordingly, an ALJ's finding should only be upheld if she gives specific reasons for the finding which are supported by substantial evidence. *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) (citation omitted).

Here, the ALJ found that Plaintiff's allegations were not consistent with the evidence. (Tr. 28). The ALJ cited Plaintiff's testimony that she found therapy helpful as evidence that her symptoms and functioning improve with treatment; found her testimony that medications had not helped her to be inconsistent with her desire to restart medications after the birth of each of her children; cited her use of marijuana; and found her testimony regarding very limited activities inconsistent with her reports of reading books, caring for herself and her children, and going out with friends. (Tr. 28-29).

With respect to the ALJ's finding that Plaintiff's self-care and childcare abilities, her ability to read books, and her report of going out with friends on one occasion represented greater ability than she alleged, Plaintiff contends that the ALJ misrepresents the evidence. (Tr. 28-29,

citing Tr. 296-97, 1914, 1954). Plaintiff points out that the report the ALJ cited reflects that Plaintiff needed her boyfriend's help to perform most tasks. (Tr. 296-97). The record consistently reflects that Plaintiff has needed help to care for her children and herself and at times was so depressed that she would have her boyfriend take her child away. (Tr. 50-53, 469, 472, 497, 500, 1436, 1915, 1989, 2134). Plaintiff's therapist guided her in doing "minimal upkeep around her house," which took a while as she was "not able to completely function on her own due to her extreme stress she is under." (Tr. 1969). There has been DCFS involvement with her children. (Tr. 2134). In December 2020, during her most recent pregnancy, Plaintiff collapsed at home after she had been under a lot of stress and not eating or drinking adequately. (Tr. 1756-57). Clearly Plaintiff's ability to care for her children, especially with the degree of help she has needed, is not inconsistent with her alleged inability to work. *Newell v. Astrue*, 869 F. Supp. 2d 875, 890 (N.D. Ill. 2012) (ALJs "must account for the important differences that exist between the flexibility and family support involved in performing daily activities and the more onerous, and potentially less flexible, duties involved in a work environment," and "[w]hen a claimant bears some responsibility for performing such duties, an ALJ cannot automatically equate the fact that [she] does so with the claimant's ability to carry out full-time work") (citations omitted). The ALJ also cited one January 2020 note when Plaintiff reported going out with friends, Tr. 1914, but neither this nor any other reports suggest she socialized with any significant frequency.

In considering whether Plaintiff's mental impairments met a listing the ALJ also noted that despite Plaintiff's reports that she did not like being around people, she was able to interact with her boyfriend daily and could shop in stores. (Tr. 23, citing Tr. 287, 296, 299). However, Plaintiff specifically said she is more comfortable at home around people she knows. (Tr. 47).

18

The ALJ did not explain how seeing a long-term boyfriend is dispositive of an ability to interact with new coworkers and supervisors.  The ALJ also ignored that this was the same boyfriend with whom Plaintiff repeatedly struggled, involving an altercation when Plaintiff threw things and, later, when he violated the order of protection Plaintiff obtained and threatened and assaulted her. (Tr. 1431, 2130, 2134). Plaintiff did not indicate in her report that she shopped often or easily, only that she went for "[ e]ssentials, clothes, food," and also reported that she went out very little unless she was accompanied. (Tr. 290). This is consistent with Plaintiff's reports that she does what she has to with the available help, including other people who have often done shopping and other chores for her. (Tr. 50-51).

Plaintiff also correctly notes that the ALJ was prohibited from drawing negative inferences from Plaintiff's treatment history without inquiring into and considering her reasons for the nature of that treatment. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *8-9. The ALJ ignored that Plaintiff was attempting to get back into therapy, and that her previous therapy had been interrupted by staff changes and the pandemic. (Tr. 48-49, 498, 1896-99). The ALJ also failed to consider that improvement with therapy had been relative at best. *See Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled…"). Plaintiff said that although she was in "a very depressed state" in 2020, it had helped her to talk to someone. (Tr. 50). The records of her therapy with Meridian make clear that Plaintiff was still exhibiting symptoms and struggling with caring for herself and her child during that period. (Tr. 1905, 1910, 1915, 1919, 1924, 1929, 1934, 1939, 1944, 1949, 1954, 1959-60, 1964, 1969, 1973-74, 1981-82, 1985-86,

1989-90).

With respect to the ALJ's assertion of inconsistencies in Plaintiff's claims that medication had not helped her, while she sought to restart medication after her children were born, Plaintiff notes that treatment for her conditions has been difficult. Plaintiff's reports have consistently stated that medication has not helped or at best has made her sleepy. (Tr. 49, 470, 498, 1882, 1934-35). After resuming Latuda in December 2019, Plaintiff did not like how sleepy it made her but agreed to continue it to allow herself time to adjust. (Tr. 1934-35). That is consistent with her efforts to get back on medication in some form because she understood it is necessary. For instance, after Plaintiff's second child was born, her treating nurse practitioner started her on a low dose of Abilify because Latuda had made her too tired. (Tr. 1998-99).  However, Plaintiff did not find Abilify helpful, so her psychiatrist started her on Lamictal. (Tr. 1882-83).

The Commissioner has not responded to any of Plaintiff's arguments on this point.  The Commissioner merely asserts, without explanation, that the ALJ's reasons were sound.

This Court finds that the ALJ's assessment of  Plaintiff's reports and symptoms was inaccurate and legally insufficient. These errors warrant remand.

Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED

AND REMANDED for further proceedings consistent with this Order.


Entered: September 7, 2022.


                                        s/ William C.  Lee
                                        William C. Lee, Judge
                                        United States District Court